## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**State College Area**    :
 **School District**    :
131 West Nittany Avenue  :
State College, PA  16801  :
         :
    Plaintiff,  :
         : Civil Action
  v.       :
         : No.
**Royal Bank of Canada**  :
Royal Bank Plaza, 2nd Floor :
200 Bay Street    :
Toronto, Ontario   :
Canada  M5J 2W7   :
         : Electronically Filed
    Defendant.  :

## <u>COMPLAINT</u>

Plaintiff State College Area School District ("SCASD"), by and through its undersigned counsel, hereby asserts a claim for declaratory relief against defendant Royal Bank of Canada ("RBC").

## Summary of SCASD's Claim

1.      SCASD seeks an order declaring **(i)** that certain forward starting interest rate "swap" agreements with RBC are void *ab initio* and unenforceable as a matter of Pennsylvania law because they do not comply with the requirements of Act 23 of the Pennsylvania Local Government Unit Debt Act, which sets forth the conditions under which local government units like SCASD can legally enter into swap agreements designed to hedge interest rate risk on bonds issued or to be issued by local government units; **(ii)** that SCASD and RBC are not obligated to make interest rate swap payments beginning on December 1, 2010 or at any other time under any swap agreement, and **(iii)** that neither party is obligated to make a swap termination payment of any amount to the other party under any swap agreement.

## The Parties

2.      SCASD is a Pennsylvania local government unit, with its principal place of business located in State College, Centre County, Pennsylvania.

3.      RBC is a Canadian foreign business corporation, with its principal place of business located in Toronto, Ontario Province, Canada.

4.      RBC is an investment bank, and counterparty to interest rate swap agreements with local government units throughout Pennsylvania.

## Jurisdiction, Venue, and Governing Law

5.     This is an action for a declaratory judgment pursuant to 28 U.S.C. § 2201 and Fed.R.Civ.P. 57 for determining a question of actual controversy between SCASD and RBC.

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) because (i) SCASD is a citizen of the Commonwealth of Pennsylvania and RBC is a citizen or subject of a foreign state, and (ii) the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.     Venue is proper in the United States District Court for the Middle District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(a) and (c) because a substantial part of the events or omissions giving rise to SCASD's claim occurred in this judicial district, and because RBC is deemed to reside in this judicial district.

8.     In addition, SCASD and RBC agreed "irrevocably [to] submit[] to the exclusive jurisdiction of the … United States District Court located in the Middle District of Pennsylvania" in connection with any dispute, and to waive (i) any objection to the laying of venue in this Court, (ii) any claim that this Court is an inconvenient forum, and (iii) any objection that this Court lacks personal jurisdiction over such party.

9.     SCASD and RBC agreed that the capacity of SCASD to enter into the interest rate swap agreements at issue or any transaction thereunder would be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

## Facts and Applicable Law

### *The Pennsylvania Local Government Unit Debt Act was amended in 2003 to authorize local government units to enter into interest rate swap agreements that relate to their bond offerings*

10.     SCASD is a local government unit as defined under the Pennsylvania Local Government Unit Debt Act (the "LGUDA").  53 Pa.C.S.A. §§ 8001 and 8002(c).

11.     Act of September 24, 2003, P.L. 110, No. 23 ("Act 23") amended the LGUDA to authorize Pennsylvania local government units like SCASD to pledge their taxing power to secure interest rate swaps and other interest rate derivatives designed to manage or hedge interest rate risk or interest cost in connection with a local government unit's issuance of debt.  53 Pa.C.S.A. §§ 8002(c) and 8281.

12.     All interest rate swap agreements entered into by local government units must be "consistent with the provisions of" Act 23 as the LGUDA "provides an exclusive and uniform system on the subjects [it] cover[s]."  53 Pa.C.S.A. §§ 8001(d) and 8281(a)(1).

### *Interest rate swap agreements generally*

13.     In a typical interest rate swap, a bond issuer and an investment bank

exchange or "swap" a stream of fixed cash flows based on an agreed-upon interest

rate for a stream of variable cash flows pegged to an interest rate benchmark such

as the "London Inter-Bank Offered Rate" (a/k/a "LIBOR") at regular intervals

throughout an agreed upon term and based on a notional principal amount to be

used to calculate the amounts due.  Each interest rate — the agreed-upon fixed

interest rate and the floating interest rate based on LIBOR — is multiplied by the

notional amount to determine the payment amount that each "counterparty" (a

party to a swap) must make to the other counterparty at each interval.

14.     In theory, interest rate swaps allow variable rate bond issuers to

manage their interest rate risk and costs by agreeing to make fixed interest rate

payments to the swap counterparty over the term of their variable rate bonds in

exchange for floating-rate payments (based on LIBOR or other agreed-upon

benchmark) projected to match the bond issuer's variable rate debt.

15.     If a fixed to variable interest rate swap is terminated before its

maturity, one party will typically owe a termination payment to its counterparty.

The party obligated to make a swap termination payment, and the amount of the

payment, is a function of interest rate market conditions existing on the termination

date.  For example, if the LIBOR rate for the swap is below the swap's fixed

interest rate on the termination date, the fixed interest rate payer will owe a termination payment to its counterparty.  Conversely, if the LIBOR rate is above the fixed interest rate, the fixed interest rate payer will receive a termination payment from its counterparty.

### The Act 23 requirements for interest rate swap agreements

16.     Act 23 of the LGUDA requires a local government unit interested in pursuing a swap arrangement to, among other things, enter into a written contract that fulfills all of the statutory requirements of what is known as a "qualified interest rate management agreement" or QIRMA, and formally adopt an interest rate management plan.  53 Pa.C.S.A. § 8281(a)(1) (stating that "a local government unit may negotiate and enter into qualified interest rate management agreements consistent with the provisions of th[e] subchapter" entitled "interest rate risk and interest cost management.")

17.     The LGUDA defines a QIRMA as an "[a]n agreement, including a confirmation evidencing a transaction effected under a master agreement, entered into by a local government unit in accordance with, and fulfilling the requirements of section 8281 (relating to qualified interest rate management agreements), which agreement in the judgment of the local government unit is designed to manage interest rate risk or interest cost of the local government unit on any debt a local government unit is authorized to incur under this subpart, including, but not limited

to, swaps … and other similar arrangements which, in the judgment of the local government unit, will assist [it] in managing [its] the interest rate risk or interest cost." 53 Pa.C.S.A. § 8002(c).

18.    Specifically, Act 23 requires the local government unit to authorize and award each QIRMA or any confirmation of a transaction by resolution.  53 Pa.C.S.A. § 8281(a)(2).  The resolution authorizing and awarding a QIRMA, or authorizing a transaction under the agreement must include in the resolution, among other things, a copy of the QIRMA or confirmation of the transaction under the QIRMA in substantially the form to be executed pursuant to the resolution and an interest rate management plan meeting all Act 23 requirements.  53 Pa.C.S.A. §§ 8002(c) and 8281(b).

19.    Act 23 also requires the local government unit to file with the Pennsylvania Department of Community and Economic Development ("DCED") a certified copy of the resolution authorizing the QIRMA within 15 days following its adoption.  53 Pa.C.S.A. § 8284(a)(1).

### *QIRMA requirements*

20.    Every QIRMA "must contain all of the following:"

(1)    The covenant of the local government unit to make payments required by the [QIRMA] and the covenants authorized by section 8282.

(2)    The notional amount of the [QIRMA] and the principal amount of bonds … issued or to be issued by

the local government unit under this subpart … to which the agreement relates.

(3)     The term of any [QIRMA], which must not exceed the latest maturity date of the bonds … referenced in the [QIRMA].

(4)     A provision requiring the termination of the agreement if all debt to which the [QIRMA] relates is no longer outstanding.

(5)     The maximum annual interest rate which the local government unit may pay thereunder.

(6)     A provision that the maximum net payments by fiscal year of a local government unit shall not exceed the maximum interest rate specified in the qualified interest rate management agreement for (i) periodic scheduled payments, not including any termination payments, due under the [QIRMA]; and (ii) the interest on the bonds … to which the [QIRMA] relates.

(7)     The source of payment of the payment obligations of the local government unit, which must be either general revenues or revenues specifically identified in the agreement.

(8)     A provision addressing the actions to be taken if the credit rating of the other party changes.

(9)     A provision that periodic scheduled payments due under the [QIRMA] and debt service due on the related bonds … shall be senior in right and priority of payment to termination payments due under the [QIRMA].

53 Pa.C.S.A. § 8281(c).

### *Interest rate management plan requirements*

21.     The interest rate management plan to be included in the resolution authorizing and awarding a [QIRMA] or authorizing a transaction under the agreement is a "written plan prepared or reviewed by" the local government unit's "independent financial advisor with respect to a [QIRMA]" that states that "in the opinion of the independent financial advisor" the "financial terms and conditions" of the swap "are fair and reasonable to the local government unit as of the date of award," and must include the following schedules and analysis:

> (1)     A schedule listing the amount of debt outstanding for each outstanding debt issue of the local government unit and the expected annual debt service on that debt.  In the case of variable rate debt, the schedule shall set forth the estimated annual debt service thereon and annual debt service on the debt calculated at the maximum rate specified for the variable rate debt.

> (2)     A schedule listing the notional amounts outstanding of each previously executed [QIRMA] which is then in effect.

> (3)     A schedule listing all consulting, advisory, brokerage or similar fees, paid or payable by the local government unit in connection with the [QIRMA], and a schedule of any finder's fees, consulting fees, or brokerage fees, paid or payable by the other party in connection with the [QIRMA].

> (4)     A schedule listing the estimated and maximum periodic scheduled payments to be paid by the local government unit, and to be received by the local government unit from the other party, in each year during the term of the [QIRMA].

(5)     An analysis of the interest rate risk, basis risk, termination risk, credit risk, market-access risk and other risks of entering into the [QIRMA].  This paragraph includes schedules of the estimated and maximum scheduled periodic payments which would be due under the [QIRMA].

(6)     An analysis of the interest rate risk, basis risk, termination risk, credit risk, market-access risk and other risks to the local government unit of the net payments due for all debt outstanding and all [QIRMAs] of the local government unit.  This paragraph includes schedules of the estimated and maximum net payments of total debt service and scheduled, periodic, net payments, which would be due under all of the [QIRMAs].

(7)     The local government unit's plan to monitor interest rate risk, basis risk, termination risk, credit risk, market-access risk and other risks. This paragraph includes the valuation of the market or termination value of all outstanding [QIRMAs].

53 Pa.C.S.A. §§ 8002(c) and 8281(e).

### The 2006 Swap

22.     On or about April 25, 2006, SCASD entered into a forward starting fixed interest rate swap agreement with RBC based on a notional amount of $58,050,000 (the "2006 Swap"), and with periodic payments scheduled to begin on December 1, 2007.

23.     The notional amount of the 2006 Swap related to variable rate general obligation bonds in the aggregate amount of $58,050,000 — designated as the

"General Obligation Bonds, Capital Project Series" or the "General Obligation Bonds, Series of 2007" — that SCASD had authorized two years earlier — by resolution dated August 30, 2004 — to sell, issue, and deliver to fund the cost to construct a planned new high school building.

24.     Under the 2006 Swap, SCASD would receive from RBC monthly floating-rate interest payments equal to 67% of the 30-day LIBOR interest rate and pay to RBC semi-annual fixed interest rate payments of 3.884% based on a notional amount of $58,050,000 and during a term from December 1, 2007 to May 1, 2028.

### The cancellation of the planned new high school construction project and termination of the 2006 Swap

25.     On or about May 21, 2007, the board of directors for SCASD cancelled the planned new high school construction project.

26.     As a result of the decision to cancel the new high school construction project, the variable rate general obligation bonds authorized in 2004 to fund the construction of a new high school building have not been issued and will not be issued by SCASD in the future.

### The 2007 Swap

27.     On or about November 12, 2007, SCASD and RBC attempted to amend the 2006 Swap by increasing the fixed interest rate payable by SCASD from 3.884% to 4.356%, by lowering the notional amount from $58,050,000 to

$53,900,000, and by extending the effective date by three years from December 1, 2007 to December 1, 2010 (the "2007 Swap").

28.     The 2007 Swap was not supported by a new QIRMA, a new interest rate management plan, or an accompanying fairness opinion from an independent financial advisor.  Since there was no new QIRMA, interest rate management plan, or fairness opinion, none was made part of SCASD's November 12, 2007 resolution purportedly authorizing the 2007 Swap.

29.     Moreover, a certified copy of  the November 12, 2007 resolution purportedly authorizing the 2007 Swap was not filed with the DCED within 15 days of its adoption.

30.     Under present interest rate market conditions, the termination of the 2007 Swap, assuming it was enforceable, would require SCASD to make a termination payment to RBC in the range of $10 million.

### The 2006 and 2007 Swaps are void ab initio and unenforceable because they do not relate to SCASD's existing bonds or bonds to be issued

31.     The LGUDA as amended by Act 23 authorizes local government units to use QIRMAs only in connection with bonds that have been or will be issued.

32.     In other words, local government units like SCASD lack statutory authority to enter into so-called "naked" swaps because the notional amount of every QIRMA must in the words of Act 23 "relate" to debt "issued or to be issued by the local government unit."

33.     As described above, Act 23 expressly requires every QIRMA to contain the notional amount of the QIRMA and "the principal amount of bonds … issued or to be issued by the local government unit … to which the agreement relates," and to include a "provision requiring the termination of the agreement if all debt to which the [QIRMA] relates is no longer outstanding."  53 Pa.C.S.A. §§ 8281(c)(2) and (c)(4).

34.     As noted above, interest rate swaps entered into by local government units must be "consistent with the provisions" of Act 23 to the LGUDA because the LGUDA "provides an exclusive and uniform system on the subjects covered by this [act]."  53 Pa.C.S.A. §§ 8001(d) and 8281(a)(1).

35.     That being the case, the statutory framework of Act 23 — including the requirement that the swap arrangement "relate" to bonds issued or to be issued by the local government unit and be supported by an interest rate management plan with an accompanying fairness opinion — cannot be waived.

36.     The 2006 and 2007 Swaps are unenforceable "naked" swaps because they do not relate to bonds issued or to be issued by SCASD.  As stated above, the variable rate general obligation bonds authorized by SCASD in 2004 to fund the construction of a new high school building have not been issued and will not be issued by SCASD.

### *The 2007 Swap is void ab initio and*
### *unenforceable for the additional reason that the resolution*
### *purportedly authorizing the transaction does not comply with Act 23*

37.     The attempt by RBC and SCASD in November 2007 to amend and reissue the 2006 Swap was ineffective because it did not comply with the requirements of Act 23.  Among other things, SCASD was not provided with a new interest rate management plan by its independent financial advisor or a written opinion as to the fairness of the transaction to SCASD as expressly required by Act 23.

38.     Since there is no interest rate management plan or fairness opinion for the 2007 Swap, none was made part of the November 12, 2007 resolution purportedly authorizing the 2007 Swap transaction.  As a result, the resolution is invalid and ineffective under the LGUDA and the 2007 Swap is void *ab initio* and unenforceable.

39.     The 2007 Swap is also void *ab initio* and unenforceable because Act 23 requires a new DCED filing when a QIRMA is amended, and a certified copy of the November 12, 2007 resolution purportedly authorizing the 2007 Swap transaction was not filed with the DCED within 15 days in violation of 53 Pa.C.S.A. § 8284(a)(1).

## The controversy between SCASD and RBC

40.     An actual controversy exists between SCASD and RBC with respect to the statutory authority of SCASD to enter into swap agreements with RBC that are not related to the actual issuance of the variable rate general obligation bonds authorized by SCASD in 2004 to fund the construction of a new high school building, the enforceability of the 2006 and 2007 Swaps, the obligation of the parties to make interest rate swap payments under the 2007 Swap beginning on December 1, 2010, and with respect to RBC's contention that SCASD is obligated to make a termination payment to RBC currently in the range of $10 million if SCASD does not make its first scheduled swap payment under the 2007 Swap.

## Requested Relief

WHEREFORE, SCASD respectfully requests declaratory relief in the form of an order:

(a)     declaring that SCASD lacks statutory authority to enter into swap agreements with RBC that are not related to the actual issuance of the variable rate general obligation bonds authorized by SCASD in 2004 to fund the construction of a new high school building;

(b)     declaring that the 2006 and 2007 Swaps are void *ab initio* and unenforceable as a matter of Pennsylvania law;

(c)     declaring that SCASD and RBC are not obligated to make interest rate swap payments beginning on December 1, 2010 or at any other time under any swap agreement;

(d)     declaring that neither party has an obligation to make a swap termination payment in any amount to the other party;

(e)     awarding SCASD the costs, including reasonable counsel fees, incurred in this action; and

(f)      providing such other relief as the Court deems appropriate.

Date:  August 30, 2010                    /s/ *Steven Maniloff*
                                          Steven Maniloff
                                          (Pennsylvania Bar No. 54370)
                                          **Montgomery, McCracken,**
                                          **  Walker & Rhoads**
                                          123 South Broad Street, 28th Floor
                                          Philadelphia, PA  19109
                                          (215) 772-7512 (telephone)
                                          (215) 731-3865 (fax)
                                          smaniloff@mmwr.com (email)

                                          *Attorneys for Plaintiff*
                                          *State College Area School District*

Of Counsel:

Louis R. Moffa, Jr.
(Pennsylvania Bar No. 55533)
**Montgomery, McCracken,**
**  Walker & Rhoads, LLP**
Liberty View, Suite 600
457 Haddonfield Road
Cherry Hill, NJ  08002
(856) 488-7740 (telephone)
(856) 488-7720 (fax)
lmoffa@mmwr.com (email)